Chase J. Potter
Texas Bar No. 24088245
Joshua J. Iacuone
Texas Bar No. 24036818
Greg McAllister
Texas Bar No. 24071191
Joshua L. Shepherd
Texas Bar No. 24058104
Jesse A. Okiror
Texas Bar No. 24065843
Anna Olin Richardson
Texas Bar No. 24102947
potter@imcplaw.com
josh@imcplaw.com
greg@imcplaw.com
shepherd@imcplaw.com
jesse@imcplaw.com
anna@imcplaw.com
IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
214.432.1536

COUNSEL FOR THE AGENT AND
PROPOSED SPECIAL COUNSEL FOR TRUSTEE

Davor Rukavina
Texas Bar No. 24030781
Thomas D. Berghman
Texas Bar No. 24082683
Brenda L. Funk
Texas Bar No. 24012664
Conor P. White
Texas Bar No. 24125722
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6605
Telephone: (214) 855-7500
drukavina@munsch.com
tberghman@munsch.com
bfunk@munsch.com
cwhite@munsch.com

COUNSEL FOR
SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| **WITH PURPOSE, INC.** | § | **Case No. 23-30246-MVL-7** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| **SCOTT M. SEIDEL, TRUSTEE,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adv. No. 25-_____** |
| | § | |
| **TOBY NEUGEBAUER; and** | § | |
| **NEUGEBAUER FAMILY** | § | |
| **ENTERPRISES, LLC** | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S ORIGINAL COMPLAINT

Pursuant to the court-approved 9019 Agreement and Joint Prosecution Agreement, GloriFi Acquisitions, LLC (the "Agent") as the exclusive agent of, and in the name of, Scott M. Seidel (the "Trustee" or "Plaintiff"), as the chapter 7 trustee of With Purpose, Inc. (the "Debtor" or "GloriFi" or the "Company"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), files this Original Complaint (the "Complaint") against the following (collectively, "Defendants"): Toby Neugebauer ("Neugebauer") and Neugebauer Family Enterprises, LLC ("Neugebauer Family"). In support thereof, the Trustee respectfully shows as follows:

## I.
### THE PROLOGUE

*GloriFi: The destructive story of Toby Neugebauer's
pride, self-dealing, and paranoia.*

*"There are two sides to every story. The first one to speak sounds true until you
hear the other side and they set the record straight."*

*-Proverbs 18:17*

1.      For more than two years, Toby Neugebauer focused on one thing above all else: promoting his false narrative regarding the now infamous demise of GloriFi – a company once valued at almost ***$1.7 billion*** – and making his "side of the story" known to anyone who will listen. Mr. Neugebauer did this by launching an unrelenting smear campaign (besmirching GloriFi directors, employees, investors, and others); engaging in what this Court found to be an "abuse of the bankruptcy process"; and disseminating misleading press releases, mass communications to former employees, and creditor solicitations.

2.      While Mr. Neugebauer is relentless in his propaganda, his fairytale regarding who is to blame for GloriFi's untimely downfall is ever-changing and completely bereft of evidentiary support. Mr. Neugebauer first blamed GloriFi's independent directors, who Mr. Neugebauer fraudulently removed from GloriFi's Board after they had the *"audacity"* to stand up to Mr. Neugebauer's egregious self-dealing. He then blamed the so-called "cabal of billionaires" who invested (*and lost*) millions of dollars in GloriFi. Mr. Neugebauer next turned his ire on the Wall Street Journal; the "evil New York law firm" Mr. Neugebauer hired (and then accused of conspiring against him); the prior collateral agent (but not the new, of course, because Mr. Neugebauer controls it); and – for good measure at the prior trial on the 9019 motion – Mr. Neugebauer even blamed "the Chinese."

3.      Put simply, at one time or another, Mr. Neugebauer effectively blamed everyone for GloriFi's failings. Save one: the man in the mirror. Enough is enough – enough with Mr. Neugebauer's nonsense; enough with Mr. Neugebauer's wild conspiracy theories; enough with Mr. Neugebauer's delay tactics. It is ***finally*** time to set the record straight. It is ***finally*** time for ***the real story***.

4.      It would be easy to explain GloriFi's dramatic downfall solely on Mr. Neugebauer's gross incompetence. But the real story of GloriFi's demise cannot be understood without appreciating Mr. Neugebauer's (i) unyielding desire to exercise singular control over the Company at all costs, and (ii) complete disregard and disdain for corporate governance and the fiduciary obligations he owed the Company and its many stakeholders.

5.      Despite its brief history, GloriFi – a startup fintech company ran out of Mr. Neugebauer's mansion on Strait Lane in Dallas – was on the doorstep of closing a de-SPAC transaction that would have taken the company public at a valuation of almost $1.7 billion. GloriFi

was backed by some of the most successful, wealthy, and well-known investors in the county (*e.g.*,

Peter Thiel, Ken Griffin, Jeff Sprecher, Vivek Ramaswamy, Rick Jackson, Nick Ayers, and many

others).

6.      The evidence will show that the existing investors were ready, and more than able,

to provide GloriFi the funding it needed to close the de-SPAC transaction. Unfortunately, Mr.

Neugebauer proceeded to do everything he could to wrestle defeat out of the jaws of victory. To

Mr. Neugebauer, control trumped success. His own glory trumped GloriFi's mission. The normal

corporate oversight and governance required for public companies was a non-starter. If Mr.

Neugebauer alone could not secure all the credit, accolades, and magazine covers, then Mr.

Neugebauer would rather let GloriFi burn (and, to top it all off, try to fleece the Company's

remaining assets on the eve of bankruptcy).

7.      To provide the funding needed, all the investors wanted was what Mr. Neugebauer

had always promised (and what should be expected for any company going public – especially in

such a highly regulated industry): normal corporate governance and arms-length, market terms for

the requisite financing. But Mr. Neugebauer was the personification of the proverbial dog who

caught the car.

8.      Despite representing to investors on *many* occasions that he would *not* be the CEO

of the Company when it went public *and* that the Company would implement normal corporate

governance (*e.g.*, an independent board that Mr. Neugebauer did not solely control), Mr.

Neugebauer was unwilling to relent any level of control – even if it resulted in GloriFi's demise.

Even worse, Mr. Neugebauer employed a classic "squeeze play" scheme against the Company and

its investors: Mr. Neugebauer intentionally created a cash crisis and time crunch, for the purpose

of forcing through self-dealing transactions designed to elevate Mr. Neugebauer's economic

interests – and those of his family members and related entities – to the detriment of GloriFi's

other stakeholders (in some cases misrepresenting to investors that they needed to approve Mr.

Neugebauer's self-interested transactions within mere hours or the Company would file

bankruptcy).

9.      Sadly, in the end, like a Greek tragedy, history will remember GloriFi, not for its

accomplishments, but for what could have been. Mr. Neugebauer's hubris, pride, and malfeasance

reduced the Company to a case study and warning regarding the importance of fiduciary

obligations and inherent dangers in self-interested transactions. The GloriFi story is the textbook

example of an immensely valuable company being destroyed by its own CEO, majority

shareholder, and Chairman of the Board (*i.e.*, Mr. Neugebauer) who intentionally breached his

duty of loyalty by putting his own self-interests above those of the Company.

10.      Publicly, Mr. Neugebauer claims to care about the GloriFi employees who worked

tirelessly to position GloriFi for untold success. Those employees now sit at the bottom of the

claims register in this chapter 7 case (holding equity interests that were rendered worthless by Mr.

Neugebauer's bad acts). But Mr. Neugebauer made no effort to make those employee shareholders

whole (which Mr. Neugebauer easily could do by selling his 180-foot yacht, palatial ski house,

private jet, or otherwise dipping into a small portion of his immense personal wealth). Instead, as

the Court already determined, Mr. Neugebauer engaged in an "abuse of the discovery process"

and is "the man behind the curtain" in this bankruptcy case – *still* pulling the strings, *still* trying to

wrangle control, and *still* only looking out for his self-interests to the detriment of GloriFi and,

now, the Company's Estate.

11.      That should come as no surprise. While Mr. Neugebauer feigns empathy for the

shareholders, creditors, employees, and other stakeholders of GloriFi, the evidence shows the

opposite. Cathy Landtroop (a former GloriFi employee) perhaps said it best in her e-mail to Mr. Neugebauer in the waning days before the Company filed bankruptcy:

> *"As you've reminded us all for months. You will leave GloriFi and only be richer. You will buy a bigger boat. A bigger plane. Make another $11mm in one week. It is the rest of us that get to return to whatever job we can find amidst the economic meltdown."*

12.     There is only one way Mr. Neugebauer will make the stakeholders in GloriFi whole: if Mr. Neugebauer is forced to do so through the imposition of a *massive* monetary judgment against him. Mr. Neugebauer must be held accountable for his shocking self-dealing, fraud, and gross mismanagement – all of which caused GloriFi to suffer ***enormous*** monetary harm. Mr. Neugebauer, and not GloriFi's investors and hardworking employees, should be the one to pay for the "economic meltdown" that he wrought. And, for the reasons set forth herein, that is exactly what should happen. In this lawsuit, the Trustee asserts the following claims against Toby Neugebauer: (1) breach of fiduciary duty, (2) securities fraud, (3) negligence/gross negligence, and (4) breach of contract.

## II.
### JURISDICTION AND VENUE

13.     On February 8, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "Estate").

14.     The Trustee is the duly appointed chapter 7 trustee of the Estate.

15.     The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

16.     Such jurisdiction is core under 28 U.S.C. § 157(b)(2). To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of final orders and judgment.

17.     Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.
### THE PARTIES

18.     The Trustee is the chapter 7 trustee of the Estate and files this Complaint in such capacity.

19.     Defendant Toby Neugebauer is a resident of the State of Texas. Pursuant to Fed. R. Bankr. P. 7004(b), Neugebauer may be served with process in this Adversary Proceeding anywhere that he may be found, including at his home address: 10777 Strait Lane, Dallas, Texas 75229.

20.     Defendant Neugebauer Family Enterprises, LLC is a limited liability company organized and existing under the laws of the State of Texas. Pursuant to Fed. R. Bank. P. 7004(b), Neugebauer Family Enterprises, LLC may be served with process in this Adversary Proceeding by and through its registered agent as follows: Capitol Corporate Services, Inc., 1501 S Mopac Expy, Ste 220, Austin, Texas 78746.

## IV.
### THE FACTS

*GloriFi's beginnings and original vision.*

21.     GloriFi was described as an "unapologetically pro-America, pro-freedom, pro-capitalism technology company, offering best-in-class financial products empowering members to put their money where their values are and preserve the Country they believe in." GloriFi's mission statement was noble:

*"We are 100 million strong and empower like-minded Americans to take control of their finances. We only support policies that are pro-American, pro-capitalism, pro-faith, pro-law enforcement, and pro-freedom."*

22.     In a press release about GloriFi, Neugebauer said: "We didn't create the movement. One hundred million Americans who want to be free to express their love of God and country did. We created the marketplace where hard-working freedom-loving people can enjoy big tech without having to sacrifice their values." Early in the Company's life, the Company secured immense support – and substantial funding – from very well-known, influential, and well-heeled investors.

---

**GloriFi initially garnered support from many of the most successful investors in the world and quickly raised over $50 million.**

---

23.     By late November 2021, GloriFi raised approximately $53 million in convertible notes at a $750 million valuation from some of the most successful and influential businesspeople in the world. Despite making allegations that these highly respected and sophisticated investors conspired against Neugebauer to somehow "steal the company" from him, Neugebauer regularly bragged that, according to Neugebauer, it was himself – not Nick Ayers (co-founder of, and one of the major investors in, GloriFi) – who had the relationship with, and secured investments in GloriFi from, many of the very same investors.

24.     At the request of some of the largest investors, and due to Neugebauer (an insider and director) having such a large stake in GloriFi, contractual side letters were issued that generally provided the investors' notes could not be converted and GloriFi's "tech stack" could not be transferred or have debt placed on it exceeding $5 million. As Neugebauer knew, the contractual side letters were extremely important to the first round of investors and, without the side letters,

GloriFi would not have been able to secure over $50 million in convertible notes from the investors.

25.    Neugebauer repeatedly represented to the investors that the tech stack was an extremely valuable asset. In fact, Neugebauer claimed – at least in his conversations with the individuals he was trying to convince to invest millions of dollars in GloriFi – that the tech stack was worth in excess of $100 million. Neugebauer assured the investors that the tech stack made their investment in GloriFi a "risk free" proposition, because Neugebauer promised he would simply sell the tech stack and return their investment if GloriFi was not able to go public. That was one of many lies Neugebauer made in soliciting investors.

26.    Despite ultimately agreeing to and signing the contractual side letters, Neugebauer initially resisted them. The reason for Neugebauer's opposition to the contractual side letters is now clear – the investor protections provided by the contractual side letters made it much more difficult for Neugebauer to engage in unashamed self-dealing and misappropriate the tech stack for himself (which is exactly what Neugebauer ultimately did).

*__Heading into March 2022, the investors were prepared to provide the necessary funding to complete a merger with GloriFi's SPAC partner at a $1.7 billion valuation – but Neugebauer killed the deal by disregarding his fiduciary duties and engaging in blatant self-dealing.__*

27.    At the beginning of 2022, GloriFi was on track to announce and move forward on a SPAC transaction with a reputable partner – DHC Acquisition Corp. ("DHC") – at a very attractive $1.7 billion valuation.

28.    Around this same time, DHC's independent assessment of the business, which was performed by KPMG, indicated a number of "red flag" issues that prevented GloriFi from public market readiness, which included major C-suite gaps, lack of regulatory approvals or compliance,

and lack of financial controls. Ironically, given Mr. Neugebauer's propensity for blame-shifting and accusing others for GloriFi's downfall, those very issues (*i.e.*, the issues that were putting GloriFi in danger of not being able to close the contemplated SPAC transaction and going public) were the same issues and concerns the investors (*e.g.*, Ayers, and Neugebauer's hand-picked, independent Board member (Keri Findley)) had consistently raised, focused on, and implored Neugebauer to address.

29.     These issues could have been easily resolved, and GloriFi would have been able to secure the financing needed to close the transaction with DHC, had Neugebauer simply made good on his original promise to investors that Neugebauer would implement the typical governance controls of a company preparing to go public and not engaged in rampant self-dealing. But Neugebauer refused and, instead, developed and implemented a scheme to increase his financial position in GloriFi and protect his personal investment to the detriment of all other investors – notwithstanding the extreme harm Neugebauer would cause GloriFi to suffer by so blatantly breaching the fiduciary duties he owed GloriFi.

30.     On Sunday, March 27, 2022, Neugebauer sent an e-mail to Ayers, Findley, and others saying:

> *"I am going to put in 10mm of super senior convertible note at the 750 valuation [i.e., a **significantly** lower valuation than the $1.7 billion valuation for the contemplated SPAC transaction] if I can get Ken [Griffin] to join."*

31.     Findley sent the following response to Neugebauer:

> *"I believe that is at odds w[ith] the [contractual] side letter and we need shareholder approval."*

32.     But Neugebauer was undeterred by the contractual side letters (*i.e.*, the noteholder protections) or the need for noteholder approval – Neugebauer was focused on forcing through his self-dealing transactions through whatever means necessary.

33.     Early in the morning on Sunday, March 27, Neugebauer sent an e-mail to William Izlar asking Izlar to send an invite to all investors and senior leadership for a call at 6 p.m. that evening with Bank of America (the bank working with DHC). Neugebauer wanted Ayers to reach out to all investors and encourage them to attend the call. Ayers responded:

> *"10 hour notice for something that the company is saying is important will look desperate" and that "[i]n the past when [the investors] were given only 1 day notice of calls there wasn't much participation."*

34.     Once again, Neugebauer did not heed the advice and concerns of the other Board members. Instead, Neugebauer proceeded with his plan to create an artificial time crunch in hopes of exerting undue pressure on the other investors and force them to approve Neugebauer's self-dealing transactions.

### *Neugebauer deceives and defrauds the noteholders on an "all investor" call.*

35.     Neugebauer held the call with investors that Sunday evening during which he represented to the investors that GloriFi was "married to DHC" and that a new term sheet from DHC would be forthcoming. During the call, Vivek Ramaswamy, the second largest investor in GloriFi, asked for assurances that it would be a clean term sheet from DHC at a fair valuation. Neugebauer assured everyone it would be.

36.     However, what transpired over the next week made clear that Neugebauer was only concerned with protecting his investment – notwithstanding his prior representations to the other investors or whether his proposed, self-dealing transactions would harm GloriFi and its investors. Only Neugebauer mattered to Neugebauer.

---

***Neugebauer admits, in writing, that he wanted GloriFi's tech stack "for himself" and threatens, in a recording, that Neugebauer and his family were "just going to take it."***

---

37.    On March 27, Neugebauer made his self-interested intentions abundantly clear. In

an e-mail, Neugebauer wrote:

> *"I knew this was coming and frankly **I want for myself**. Highly confidentially Chris Gaertner [DHC] has a person he has worked with for 25 years. He is a player at 50 [million]. I do not want this discussed with anyone that is not on this email. But he and I and anyone else is going to want a **security interest in the tech stack**. Let's incorporate as I will need to get investor approval in the am. As we are down to last 5mm as projected."*

38.    After admitting that he wanted the tech stack for himself, Neugebauer sent another

telling e-mail in response to a question regarding the expected timing of Chris Gaertner's investor

putting in the $50 million needed to close the de-SPAC transaction:

> *"We will know in 48. I am going to have to do a deal by cob tomorrow. I want to go to the investors with a term sheet **for me** that is going to be close to what we think this guy will want. Do not share….**I have to keep the pressure on existings** cause the banks are going to want to see them in . . . ."*

39.    As if these e-mails did not make it clear enough that Neugebauer intended to engage

in rampant self-dealing (which resulted in the Company's destruction), Neugebauer removed all

doubt in a recorded conversation during which he said:

> *"We're really close on the fundraising, and we're gonna get the fundraising, and – it not – I think **my family is just gonna take it**. Nate and Noah [Neugebauer's sons] said we'd rather be poor than take this sh\*t . . . .  I am not going to give a bunch of billionaires a free call option on the greatest unicorn in the history of unicorns. Because that's what this [GloriFi] is."*

40.    Unlike his many lies to GloriFi's investors, Mr. Neugebauer made good on these

statements and set out on a crusade to take the tech stack for himself.

---

*Neugebauer pressures the other directors and stonewalls their attempts to obtain an independent legal and financial analysis of Neugebauer's proposed term sheet.*

41.     At 6:51 a.m. on Monday, March 28, Neugebauer e-mailed Ayers and Findley and asked: *"Can you two vote one way or the other on the marketing agreement and the technology agreement?"* These two proposed agreements were part of the self-dealing transaction that (i) would have resulted in Neugebauer transferring the tech stack to himself – a GloriFi asset that was protected by the contractual side letters and that Neugebauer had previously touted as being extremely valuable (over $100 million according to Neugebauer) and the most important safeguard for the investors against potential loss; (ii) would have permitted Neugebauer to collect fees from GloriFi; and (iii) was entirely different than what Neugebauer represented during the investor call the prior night. In an effort to pressurize Ayers and Findley to approve Neugebauer's self-dealing transactions, Neugebauer sent the following e-mail minutes afterwards: *"I am going to need to let people go."* In other words, Neugebauer was trying to create the false impression that only his self-interested transactions could save GloriFi and its employees.

42.     Ayers previously made clear to Neugebauer that it was important and necessary for the Board to obtain an independent legal and financial analysis before voting on the proposed agreements so the Board could make an informed decision. Findley was of the same mindset and responded to Neugebauer's e-mail by stating: *"We will vote as soon as we have the lawyers' analysis on it."* Ayers responded and reiterated the need for the previously requested legal analysis. Company counsel was supposed to provide the analysis but never did.

43.     In a sign of things to come, Neugebauer attempted to dissuade the desire of the other Board members to gather the necessary information to make an informed decision and, instead, applied pressure for them to approve Neugebauer's proposal:

> *"The fed has done that it's the most over legaled [sic] thing of all time. If we can't do this…...I am offering everyone all whom are wealthy a chance to buy in the bank. This is not that hard."*

---

### Major investors expressed concerns regarding Neugebauer's ability to lead the Company, but Neugebauer attempted to shift blame.

---

44.    On March 28, Neugebauer was also communicating with Rick Jackson – one of GloriFi's largest investors. Neugebauer asked Jackson for an in-person meeting that day (despite being told by Jackson's assistant that he was not available) to, in Neugebauer's words, *"make the case for you to support the company on behalf of the 125 people who have accomplished something that has never been done before."* Jackson's response highlighted many of the pitfalls in Neugebauer's leadership and same "red flags" (all related to and/or caused by Neugebauer) that were previously identified by KPMG. The following are some of the highlights of Jackson's e-mail to Neugebauer:

> *"I heard that you had an LOI with a SPAC and a broker sourcing $40mm for a bridge. Unfortunately, I have had no further definitive updates since this time. I don't understand why you need money now."*

> *"Since we have invested, the deal has changed multiple times, the strategy has changed several times, we have been asked to sign documents that waive significant rights without any explanation, and now you need more money."*

> *"You guys are moving very fast and loose and are taking your investors for granted."*

> *"It is a red flag that you are all over the map."*

> *"Based on the initial experiences, I need to see more operational discipline before we will invest more."*

45.    Rather than accepting the constructive criticism from Jackson, Neugebauer chose to ignore his own shortcomings as the Company's CEO and attempted to shift blame. Specifically, Neugebauer sent an e-mail to Ayers and Findley making the bizarre statement that:

---

*"I have shown the email Rick Jackson sent to me yesterday to the entire team….All feel the same way. Betrayed."*

46.    Neugebauer's blame-shifting and conspiracy theories align perfectly with Neugebauer's (i) decision to terminate key executives during critical times (ironically, on the same day Jackson sent his e-mail identifying lack of operational discipline as a roadblock to GloriFi obtaining additional financing, Neugebauer was trying to pressure GloriFi's Chief Human Resources Officer into resigning), and (ii) wild accusations against the long list of individuals who Neugebauer claims were somehow "conspiring" against him to "steal the company."

---

***Neugebauer continued to pressure the other Board members, with overt threats, to approve his self-dealing transaction without the benefit of the requested legal and financial analysis.***

---

47.    On March 29, Neugebauer continued pushing his "squeeze play" on GloriFi's other Board members. After business hours at 5:08 p.m., Bryan Joiner (GloriFi employee) sent Neugebauer's proposed term sheet to Ayers and Findley (with copy to Neugebauer) and asked to schedule a Board meeting for the next morning. Findley responded:

*"I can be available however this is a lot of information that we need to review."*

48.    The next morning (March 30), Findley sent another response regarding the proposed term sheet saying:

*"We need to go through this line by line but this term sheet is not going to work for the company. You [Neugebauer] have a fiduciary duty to this company. This [term sheet] does not reflect that."*

49.    Ayers, yet again, reiterated that the legal analysis from GloriFi's company counsel was necessary so that the Board could make an informed decision. Ayers requested that Neugebauer ensure that Company counsel to provide the previously requested analysis. Rather than doing so, Neugebauer shifted blame and made veiled threats of litigation against Ayers and

---

Findley just because they wanted to make an informed decision as Board members. For example, Neugebauer made the following comments in response:

> *"The terms offered more than fair . . . . But material harm being done to company . . . And not by me."*

> *"The company is being materially harmed . . . . I will abstain but we are voting from shareholders . . . But y'all [sic] responsibility is to shareholders . . . . Everyone going on record . . . . This ends today."*

> *"Board members who interfere with creditors will have broken that trust . . . . the company has sought counsel on that already."*

50.     Despite Neugebauer claiming he would "abstain from voting," he did not recuse himself from the self-interested transaction as promised and, instead, continued to call Ayers and Findley to berate them and demand they approve it. Further, rather than ensuring that the requested legal analysis was obtained – so that the truly independent members of the Board could make an informed decision – Neugebauer lied by claiming that GloriFi's company counsel (i) told Findley that the legal analysis of the proposed marketing agreement and asset purchase agreement came in clear of conflicts or issues, and (ii) said that Ayers was wrong to ask for legal briefing and was making a mountain out of a molehill. GloriFi's company counsel confirmed that these claims by Neugebauer were ***false***.

***Neugebauer refuses to circulate the proposed term sheet from the potential SPAC merger partner and the Board receives serious complaints regarding Neugebauer.***

51.     At 4:15 p.m. on March 30, Findley requested that Neugebauer circulate the DHC term sheet that he promised to distribute during the call with all investors just three days prior. Neugebauer refused to provide the DHC term sheet.

52.     Shortly thereafter, at 7:09 p.m., GloriFi's Chief Human Resources Officer – who Neugebauer was trying to pressure into resigning during this critical juncture – sent an e-mail to

Ayers and Findley with an attached document outlining the many concerns the CHRO had

regarding Neugebauer and the toxic work environment and culture he had created at GloriFi. The

CHRO's email included numerous examples of employees complaining about Neugebauer's

alcohol usage during work hours, erratic behavior, and general abuse and intimidation of

employees (including screaming at and cussing out employees over absurd and seemingly

fabricated issues). The CHRO included the following specific examples:

> *"Several people working at the mansion told me to make sure I leave around 6. When I inquired why, they stated that after 5 PM Toby starts drinking and things at the house deteriorate quickly."*

> *"Received a text . . . that Toby was on a call with a team and was drunk and cussing the team out."*

> *"[Employee] calls me and in conversation talks about Toby's drinking at the house and that people see him putting vodka in his red bull in the morning."*

> *"[Employee] called upset about the credit card and said she would like to resign because Toby was abusive to her on the phone and it reminded her of her ex-husband who was an alcoholic. When I called to coach Toby he started yelling at me and told me that I was trying to blackmail him."*

53.     Around the same time, Findley and Ayers received another letter from a concerned

GloriFi employee in which the employee reported similar concerns regarding Neugebauer's

shocking/inappropriate behavior and extreme mistreatment of GloriFi employees. Specifically, in

reference to working for GloriFi at Neugebauer's mansion in Dallas (which is a replica of the

White House and, as of the date of this filing, is currently listed on the market for $40 million), the

employee stated:

> *"I have never witnessed an environment with more toxicity, hostility, harassment (both intimidation and allowing open sexual harassment), backstabbing, and pure risky and unprofessional conduct."*

---

***Neugebauer creates artificial time crunches, lies, and threatens bankruptcy to try to coerce the other directors and investors to approve his self-dealing.***

---

54.     Late in the evening on March 30, the focus of Neugebauer's squeeze play turned to the other investors. Around 11:48 p.m., Izlar sent the investors Neugebauer's proposed term sheet, along with a capital raise presentation, for review and approval and said that the GloriFi's company counsel would be "circulating a waiver and consent for tonight via DocuSign for execution," but the presentation did not align with what the investors were actually being requested to sign via DocuSign.

55.     Early the next morning, Neugebauer began making groundless claims that the "[t]he convert note holders want to steal co." Moreover, to turn up the pressure on his squeeze play, Neugebauer threatened to throw GloriFi into bankruptcy ***that*** ***afternoon*** if Neugebauer did not receive the approvals necessary on the term sheet and receipt of legal waivers he circulated approximately six to seven hours before.

56.     In response to Neugebauer's threats to cause the Company to file bankruptcy if Neugebauer's demands were not met, Findley sent Neugebauer the following:

> *"Toby, if you file [for bankruptcy] the convertible noteholders get the tech stack from my understanding of the docs. You will not keep anything. Again, you have a term sheet from DHC that you won't show me. You said you would put in the first 10mm of the capital for DHC's term sheet on the call with ALL of your investors on Sunday. Put in the 10mm you said you would and let DHC come w the rest over the next 30 days. This is the only option you have and you promised your investors you would do it."*

57.     Ayers responded to Findley's message saying:

> *"If we follow that path[,] I believe we will get to the 40 [million in funding] . . . . I actually think if we go this route our momentum is back quickly."*

58.     Rather than listening to the concerns from Ayers and Findley, Neugebauer focused his efforts on turning up the pressure and, through various misrepresentations and blatant lies, trying to convince various significant investors that (i) they would have the deciding vote, and (ii) if the investor did not vote as demanded by Neugebauer, that investor would be responsible for forcing the Company into bankruptcy—which, of course, was ***untrue***.

59.     For example, at 7:53 a.m. – mere hours after proposed waivers of significant rights were circulated to the investors in the middle of the night – Neugebauer sent Ramaswamy an e-mail claiming that Neugebauer had *"the support of 49.3 percent of note holders"* and that Ramaswamy would be the *"deciding vote"* and was "forcing co into reorg." It is preposterous to believe that, between midnight and 7:53 a.m., Neugebauer was able to secure the support of 49.3 percent of the noteholders. However, Neugebauer hoped that his misrepresentation would cause Ramaswamy to vote as Neugebauer wanted.

60.     Ramaswamy sent the following response to Neugebauer:

*"I will not stand in the way of anything the other note holders want to do. If the other note holders provide support, I have no objection."*

61.     Neugebauer responded and said, in part:

*"I will need your vote this am. On with BK counsel."*

62.     In essence, Neugebauer's message to Ramaswamy and others was, "do what I say…***or else***." Specifically, the "***or else***" threat being made by Neugebauer is that he would throw GloriFi into bankruptcy – thereby causing the noteholders to lose their investment and the employees to lose their jobs – unless his self-dealing transaction, designed to protect his investment and personally enrich himself, was approved.

63.     Simultaneously, Neugebauer kept the pressure on the other Board members. Neugebauer sent an e-mail to Ayers and Findley saying:

> *"Expect Rick Jackson to approve . . . . said no one ever ask [sic] him to invest or show him materials on co."*

64.     Ayers knew that Neugebauer was wrong about Jackson not being shown materials on the Company or being asked to invest, but Ayers was surprised to hear that Jackson supported Neugebauer's proposed term sheet and requested waiver (especially given Jackson's recent e-mail discussed above).

65.     Jackson called Ayers later that day to find out what was going on given the ridiculous late night and short fuse requests from Neugebauer. When Ayers explained that he was under the impression from Neugebauer that Jackson supported Neugebauer's proposed course of action and waiving the consents, Jackson confirmed that Neugebauer's representations were untrue. That is just another example of Neugebauer's fraud for the purpose of trying to create the illusion of support for his self-dealing proposal.

---

**Neugebauer threatened investors who resisted Neugebauer's self-dealing.**

---

66.     On March 31 at 9:49 a.m. (the morning after Neugebauer circulated the proposed term sheet and waivers), Ramaswamy sent the following e-mail to Neugebauer, Ayers, Findley, Jackson, and others:

> *"I haven't had a chance to review the documents that came in over the last 24 hours, but I'm supportive of Toby putting capital into the company and keeping it very simple:*
>
> *Just expand the prior convertible note offering to allow Toby to put in capital on the existing same terms as the prior convertible note from November, and the existing note holders would get a pro rata right to participate in the next [15-30] days. Simple.*
>
> *Those documents were carefully crafted with input and alignment from all note holders, so simply using that will avoid the need to reinvent the wheel with a new set of documents for a new security in a rush.*

*Assuming the other major note holders have no objection, I would be supportive of that."*

67.     Was Neugebauer receptive to this potential solution, which would allow other noteholders to participate in the same manner as Neugebauer? Of course not. In fact, Neugebauer placed a terrifying phone call to Findley wherein Neugebauer (i) accused Ramaswamy of trying to steal the Company, and (ii) made very serious threats.

---

***Neugebauer held the signed DHC term sheet hostage and told GloriFi's employees and investors that he would only honor it if they approved Neugebauer's self-dealing transaction.***

---

68.     Unbelievably, on March 31 at 1:28 p.m., Neugebauer sent an e-mail containing an image of what appears to be the *fully executed* signature page of the withheld DHC term sheet to all of GloriFi's employees and three of GloriFi's largest investors – Citadel (through Cason Carter), Vivek Ramaswamy, and Rick Jackson. In this e-mail, Neugebauer effectively admits he was holding the *signed* DHC term sheet hostage:

> *"I will fund today*
> *Based on my terms*
> *But will honor this [the signed DHC term sheet] if it closes*
> *Bryan [Joiner]*
> *You can wire*
> *if they sign ours [Neugebauer's self-dealing transaction] and then of [sic] the money comes in for this."*

69.     While written in his typical, rambling fashion, Neugebauer's message was clear – he intended to withhold the promised DHC term sheet (which both Neugebauer and DHC had apparently already signed) and only honor same ***if*** GloriFi's employees and investors conceded to Neugebauer's demands and approved Neugebauer's self-dealing terms. In other words, Neugebauer was only willing to do what was best for GloriFi ***if*** the deal Neugebauer designed for

---

his personal benefit was approved first. It is hard to imagine a more textbook breach of a director's duty of loyalty to a company.

70.     Cason Carter of Citadel responded with the following: *"We [Citadel] have not approved your [Neugebauer's] terms. As I have previously said, we would like the opportunity to review the DHC term sheet and relevant due diligence documents before deciding whether to move forward."* Thus, the investors who Neugebauer has claimed were trying to "steal the company" (in an effort to deflect attention from his own wrongdoing) were simply asking Neugebauer to provide the DHC term sheet (which Neugebauer previously promised the investors he would) and relevant due diligence documents for their review before the investors made a decision.

---

***Neugebauer falsely represented to investors that they each had the "deciding vote" and, if the investor didn't vote in favor of Neugebauer's self-dealing, that investor would force GloriFi into bankruptcy.***

---

71.     Neugebauer then began applying pressure to other major investors in the hopes of making them surrender to his squeeze play and demands through more lies, deceit, and fraud. Specifically, at 1:37 p.m., Ayers received the following e-mail from Andy Rolfes (who copied Steve Gertz the Managing Partner and Chairman of Rhythmic Ventures):

From: Andy Rolfes andy@rhythmicventures.com
Subject: Glorifi, Questions Rhythmic Capital.
Date: March 31, 2022 at 1:37 PM
To: na@nickayers.com, Steve Gertz steve@rhythmicventures.com, keri.Findley@gmail.com



Nick,

We just got off a call with Toby.

He made a few comments, and we want to know if you can verify.

1. Chris Gartner- is in favor of the newly shared term sheet. He also stated Chris was on the line and could verify this comment. But Chris never spoke up.
2. Stated that Rhythmic Capital would be the deciding vote on term sheet approval that would keep Glorifi from declaring bankruptcy at 4pm today.
3. Stated he had 100% employee support in taking this approach
4. Stated that You had not asked a single investor to invest in this coming round. Mentioned Rick Jackson, Griffin, etc hadn't even seen it.
5. Toby Stated he was under the impression the spac deal was a go until two weeks ago. (The Moelis Deal)
6. He is boarding a flight with Tom (Chris's Partner) to go to Vegas to meet with the Adelson's
7. Again, he states we have until 4pm CT to sign what he sent us or the company is declaring bankruptcy. He is putting this decision on us as we give him the 50% share he needs outside his own stake.

Please help us verify these statements so we can make an informed decision on how to proceed.

Something is off, and not adding up!

God Bless.

AR

72.    Once again, Neugebauer attempted to pressure a major investor into approving Neugebauer's self-dealing under the false pretense and threat of GloriFi filing bankruptcy ***that afternoon*** – if Rhythmic Capital did not concede and approve.

---

***Neugebauer was advised by counsel that removing Board members for the purpose of forcing through Neugebauer's self-dealing would harm the Company; Neugebauer didn't care.***

---

73.    At 2:36 p.m., Neugebauer made the bizarre decision to forward an e-mail from a lawyer to all GloriFi e-mail users and some of the major investors; the lawyer's e-mail included:

*". . . my strong view is that having the stockholders (without you) remove / replace board members in order to approve the note is highly likely to lead to a lawsuit. It sounds to me like the other board members need to talk to counsel about the situation and assess the risks. What's the consequence if we don't get this done*

*today and we give the board a few more days to weigh everything? I know Bryan [Joiner] was talking to the accountants to see if there is a way to mitigate the hit to the financials."*

74.     Based on this e-mail, it was clear that Neugebauer's plan was to ignore legal advice and remove any Board member who insisted on being independent and informed (as all Board members should be), and replace those Board members with Neugebauer's friends and cronies who would do his bidding without offering any resistance. And that is ***exactly*** what Neugebauer ultimately did – to the extreme detriment, and ultimate demise, of GloriFi.

***Neugebauer finally circulated the SPAC partner's term sheet after his initial "squeeze play" failed.***

75.     Ultimately, numerous major investors – including Cason Carter of Citadel and Rick Jackson – did not approve of Neugebauer's terms. As discussed above, Carter specifically stated that Citadel wanted the opportunity to review the DHC term sheet and relevant due diligence documents before deciding whether to move forward (Neugebauer had promised to all investors that such term sheet was forthcoming just days earlier – prior to implementing his squeeze play in a frenzied effort to force through his self-dealing transaction).

76.     Finally, at 4:31 pm on March 31, Joiner circulated the DHC term sheet that had been previously promised by Neugebauer.

***Neugebauer turned his attention to stacking the Board of Directors with "friendlies" who would do his bidding.***

77.     The next day (April 1), Neugebauer focused on "stacking the deck" with friends on the Board to ensure that his future self-dealing efforts would not be thwarted by independent and objective directors.

78.     At 12:51 p.m., Neugebauer sent Keri Findley an e-mail asking her to resign from the Board. At 2:55 pm, Neugebauer sent a threatening e-mail to Ayers filled with baseless allegations. Then, at 3:07 p.m., Neugebauer sent Ayers and the Company's counsel an e-mail instructing that the business of GloriFi "*[i]s not [to] be discussed with [board member] Keri [Findley] again.*"

---

**Neugebauer tries to hold Board meeting without proper notice.**

---

79.     On April 2 at 9:37 a.m., Neugebauer sent Ayers an e-mail with the subject line "*Board meeting of GloriFi*" with the content "*at 2 Est today.*" But no proper notice or agenda was provided. Thus, the proposed Board meeting on April 2 was not held. Neugebauer tried, again, to set a meeting for April 3 but, once again, failed to provide proper notice.

80.     At 7:33 p.m. (after not being able to push through an improperly noticed Board meeting), Neugebauer sent Ayers the following message, which foreshadowed Neugebauer's scheme to remove Ayers from GloriFi's Board and stack the Board with Neugebauer's friends who would simply rubberstamp Neugebauer's self-dealing:

> *I told you yesterday*
> *You have already violated your duties to company*
> *Kerri [sic] is not a director of Glorfi [sic]*
> *You are not authorized to talk to her about glorfi [sic]*
> *Again*
> *She is not a director*
> ***For the next few hours it's just us***

81.     Finally, at 10:15 p.m. Neugebauer made the ridiculous demand on Ayers to violate his fiduciary duties and stop communicating with GloriFi's investors. Specifically, Neugebauer told Ayers, "*Stop it now . . . . Right now . . . Do not talk to another investor.*"

82.   On April 3, Ayers received notice that Charlie Hamilton (Neugebauer's longtime best friend and business partner) had been appointed to fill the Board seat previously held by Findley. Neugebauer's plan to "stack the deck" with "friendlies" on the Board who would do Neugebauer's bidding without reservation was coming to fruition; Neugebauer needed only to develop a scheme to get rid of Ayers.

---

*After removing Findley from the Board, Neugebauer wrongfully eliminated Ayers's Board seat so Neugebauer would be free from any Board oversight and able to engage in unfettered self-dealing.*

---

83.   On April 4, Ayers received a Notice of Special Meeting of the Board stating that:

> *"[t]he purpose of the Meeting is to approve proceeding with a capital raise up to $10,000,000 by the issuance of additional shares of the Company's Class A common stock (the "Shares") at a valuation of $250,000,000 (the "Issuance") to Neugebauer Family Enterprises, LLC (the "Lead Investor") and certain other existing stockholders of the Company (together with Lead Investor, the "Purchasers")."*

84.   Ayers had obvious concerns regarding Neugebauer's proposed self-dealing transaction and whether it was in the best interests of GloriFi and its investors. First, the proposal would permit Neugebauer to invest $10 million at a valuation $575 million *less* than the valuation used for the initial round less than 120 days before (and *exorbitantly less* than the $1.7 billion valuation that was circulated earlier in the year as part of the potential SPAC merger transaction). Also, no legal analysis had been provided by GloriFi's company counsel -- despite Ayers repeatedly asking for same in relation to proposed terms sheets on which the Board was being asked to vote.

85.   Ayers was further concerned, among other issues, that the proposal would crush GloriFi's forward momentum on valuation increases and potentially have a negative impact on the rights of other investors (*e.g.*, violate the contractual side letters). Moreover, these issues were all

coming on the heels of Neugebauer removing Findley (the independent director who Neugebauer

himself appointed to the Board in the first place) from the board and replacing Findley with

Neugebauer's long-time friend and "yes man" Charlie Hamilton.

86.     On April 5, 2024, Ayers sent a lengthy letter to the Board summarizing his many

concerns. The April 5 letter from Ayers to the Board begins by outlining concerns regarding the

self-dealing transactions Neugebauer proposed and was trying to push through:

> "I have repeatedly asked for an impartial review of the terms of the proposed
> interested transactions . . . . I do not believe the proposed Asset Transfer Agreement
> ("ATA") is fair to the Company or in GloriFi's best interests, and I request that the
> Company's counsel at Winston & Strawn promptly disclose all material
> information to both the Company's stockholders and holders of convertible notes
> before Mr. Neugebauer attempts to improperly force through unfair, self-dealing
> transactions following an extremely troubling and insufficient process under
> Delaware law."

> [. . .]

> "In addition, I request that, at the start of the Board meeting, Company counsel
> provide a summary of the fiduciary duties of directors under Delaware law,
> including advice on the appropriate process considerations with respect to the
> Board's evaluation of conflicted transactions with a controlling stockholder (such
> as the ATA) as well as regarding issues of director interestedness and
> independence. I also request that Company counsel advise the Board on what
> information should be provided to the Company's stakeholders to inform them of
> these developing events."

> [. . ]

> "My understanding based on the previous board meeting is that terms of the ATA
> will have GloriFi transferring significant assets to Animo and, rather than receive
> a monetary payment in return, must also pay Animo 'a fee in the amount of five
> million dollars . . . for the implementation and setup of the Banking Platform.' Thus,
> **not only is GloriFi transferring significant assets to Animo, it must also pay $5
> million to do so** . . . . Senior Animo executives related to this transaction have
> privately expressed this concern to me but have faced negative repercussions and
> harassment for voicing any such concerns. Additionally the ATA in Article 6.5
> purports to transfer all Source Code, Software, and Intellectual Property to
> Animo—essentially, the heart of GloriFi's current and future enterprise. **This is an
> exceedingly significant asset transfer that will negatively affect GloriFi's future
> business prospects and is inconsistent with numerous prior representations made**

*by Mr. Neugebauer to investors* . . . *Those provisions illustrate why I have repeatedly stated that a formal independent review of this proposed deal is necessary before any fully informed vote to approve it may take place."*

87.     The April 5 letter from Ayers to the Board then addressed Mr. Neugebauer's failure to provide accurate information to investors with respect to the proposed, self-interested transactions:

*"Mr. Neugebauer has conveyed possibly inaccurate information in support of his efforts to move forward with, inter alia, the ATA. For instance, he informed numerous investors on March 31, 2022 that he had 'the support of 49.3 percent of note holders' with respect to entering into the ATA. Based on information available to me, it does not appear that this statement was true . . . . Mr. Neugebauer further informed certain investors that the Company had 100% employee support in proposing a $30 million senior secured convertible note offer. Once again, that was not true."*

88.     The April 5 letter from Ayers to the Board then addressed the extremely concerning circumstances surrounding Neugebauer's unilateral decision to remove Findley from the Board – the independent Board member who was selected and appointed by Neugebauer himself:

*"The unilateral April 3, 2022 removal of Keri Findley from GloriFi's Board of Directors is concerning and lacked transparency. In an email forwarded to the entire company staff, Mr. Neugebauer's own personal counsel is seen advising him not to remove Ms. Findley while the board is in the middle of requesting to conduct independent reviews of his affiliated transactions. Ms. Findley sought the same type of transaction-related information that I am requesting here, and that the two of us have requested since our first Board meeting. Not only were her requests denied, but as punishment for endeavoring to comply with her fiduciary obligations as the director of a Delaware corporation, she was removed from her position on the Board."*

89.     The April 5 letter from Ayers to the Board then addressed the underhanded scheme Neugebauer put into action to remove Ayers from the Board and ensure that all independence and oversight was stripped from the Board so that Neugebauer would be free to approve transactions designed for his self-enrichment – irrespective of whether it was in the best interest of GloriFi or its other stakeholders:

*"I am unaware whether stockholders have been fully informed about the impact of the proposed amendment to the Amended Stockholder Agreement. Specifically, that amendment fails to clearly disclose that it would remove me from the Board. I am concerned that Mr. Neugebauer is making inaccurate statements to and possibly coercing employee stockholders (who work out of his house) in order to have them vote in favor of the proposed amendment."*

90.     The April 5 letter from Ayers to the Board then exposed the flaws in Neugebauer's ploy to convert the Series 1 noteholders through Neugebauer's self-dealing transaction (in this bankruptcy proceeding, Neugebauer is attempting to utilize his flawed and ineffective scheme to argue that the Series 1 noteholders were in fact converted – they were not):

*"The second item on the Agenda relates to a capital transaction to issue $10 million of Class A shares of common stock to Neugebauer Family Enterprises, LLC and certain other investors in the Company. The term sheet describing the proposed capital transaction (the 'Neugebauer Term Sheet') appears to contain a material error in stating that the financing qualifies as 'Next Equity Financing' under the terms of the Company's existing Series 1 Convertible Notes, which would cause an 'automatic conversion' of all outstanding notes into shares of Series A common stock at a 15% discount. However, the side letters that GloriFi entered into in connection with the issuance of the Series 1 Convertible Notes state that a 'Next Equity Financing' must be a bona fide transaction on arm's length terms. The proposed $10 million financing between GloriFi and Neugebauer Family Enterprises, LLC does not meet that arm's length standard given that the financing involves GloriFi's controlling stockholder. Indeed, $5 million of that amount is proposed to be paid back to Mr. Neugebauer's bank as part of the purported ATA. In addition, as set forth in the Company's valuation and as set forth in the initial term sheet provided by an arms' length third-party reflected valuation of the Company at $750 million, while the Neugebauer Term Sheet reflects a Company valuation of $250 million, a deficit of $500 million that casts further doubts on the accuracy and veracity of the Term Sheet proposed by Mr. Neugebauer. It is my belief that the Company can be capitalized at a higher valuation."*

91.     The April 5 letter from Ayers to the Board then addressed the shocking reports from GloriFi employees regarding Neugebauer's erratic, threatening, and completely inappropriate behavior:

*"In addition to our concern over Mr. Neugebauer's treatment of the Company's investors, Ms. Findley and I also expressed overwhelming concerns regarding Mr. Neugebauer's treatment of GloriFi's employees based on our receipt of numerous complaints and other accounts of such treatment. Mr. Neugebauer, however, as*

*both the controlling stockholder and the chief executive officer of the Company, has refused to engage in any dialogue or allow the Board to conduct an independent investigation into any of these employee complaints, and he is instead interfering with the Board's ability to exercise its fiduciary duties (including the duty of oversight under Delaware law), with respect to these complaints and Mr. Neugebauer's ongoing pattern of bad behavior."*

92.    The April 5 letter from Ayers to the Board then addressed Neugebauer stacking the Board with his friends who would simply rubber-stamp Neugebauer's self-dealing:

*"I request clarity as to whether Mr. Neugebauer has unilaterally appointed Charles Hamilton to the Board. Mr. Hamilton is a long-time close friend of Mr. Neugebauer, the Company's majority stockholder and chief executive officer, and is not independent. Mr. Hamilton's addition to the board raises even more concerns around the proposed related party transaction with Mr. Neugebauer. In addition, the Neugebauer Agenda contemplates certain 'Appointments' to the Board, including the proposed appointment of John Norwood, an individual who is not known to me and who I cannot objectively consider for appointment to the Board without the benefit of additional background information pertaining to Mr. Norwood's experience, qualifications, and fitness to serve on the Board."*

---

### *Neugebauer implemented a scheme to remove all independence and oversight from the Board.*

---

93.    On April 6, pursuant to GloriFi's Amended and Restated Stockholders Agreement, Ayers exercised his right to appoint a designee to serve as the "Ayers Director" on GloriFi's Board. Ayers chose the Honorable Judge J. Michael Luttig – a respected former federal judge with whom Ayers had no prior relationship before approaching Judge Luttig to determine whether he was willing to serve on GloriFi's Board. Judge Luttig was welcomed to the Board by the other directors. Judge Luttig spent a significant amount of time meeting with the other Board members discussing potential paths forward, identifying serious concerns, and offering proposed solutions.

94.    Shockingly, after Judge Luttig had already participated as a Board member in meetings and the Board included him in the important decision making of the Company, Ayers and Judge Luttig received a ***back*** ***dated*** letter making the ridiculous claim that Judge Luttig was

---

never actually on the Board because Neugebauer had purportedly eliminated Ayers's Board seat *before* Ayers appointed Judge Luttig as the designee to serve as the Ayers Director. Neugebauer's claim was especially preposterous given that the purported consent allegedly removing Ayers's Board seat was dated as of April 5, 2022 – the *same date* of the last Board meeting that Ayers attended and participated in. At no point was Ayers's status as a Board member challenged by Neugebauer or any other Board member during the April 5 Board meeting.

95.     The incredible machinations Neugebauer implemented to remove Judge Luttig (and avoid the oversight Neugebauer knew would come along with having a disinterested/independent, former federal judge on GloriFi's Board) highlights (i) how badly Neugebauer wanted to "stack the deck" when it came to the Board, and (ii) Neugebauer's willingness to "squeeze out," by hook or by crook, anyone who planned to exercise their business judgment and, therefore, was an impediment to Neugebauer pushing through his self-interested agendas.

### *Neugebauer knows his self-dealing transaction did <u>not</u> convert the Series 1 noteholders.*

96.     After Neugebauer removed Findley and Ayers (as well as Ayers's designee Judge Luttig) from the Board and stacked GloriFi's Board with Neugebauer's friends, Neugebauer unsurprisingly moved forward with his own self-dealing transaction at the ridiculously low valuation Neugebauer artificially chose and applied to himself.

97.     On April 12, 2022, Kirkland & Ellis (representing a number of Series 1 noteholders) sent a letter to GloriFi's Board addressing Neugebauer's self-dealing transaction and the fact that it would *not* result in the conversion of the debt held by the Series 1 noteholders. The April 12 letter from Kirkland & Ellis states, in relevant part, as follows:

*"The Clients have received the Equity Offering Notice Form, dated April 6, 2022, as well as the Form of Subscription Agreement, dated as April 8, 2022 (collectively, the "Offer"). The Offer is being made in connection with a self-interested transaction between the Company and its controlling shareholder without providing material information to the offerees (such as the information I requested from the Company's counsel last week).*

*Among other infirmities, the Offer includes the material misrepresentation that "the Issuance will qualify as a "Next Equity Financing" under the terms of the Company's outstanding Series 1 convertible notes (the "Series 1 Notes") and will cause an automatic conversion of all outstanding notes." This is not true. The Offer neither reflects the good faith and fair dealing to which each Client is entitled nor satisfies the requirements of Section 7 of the side letters to which certain of the Clients are party.*

*The Offer caps several weeks in which the CEO, director and controlling shareholder [Neugebauer] and the directors he recently appointed have demonstrated an unwillingness to conduct Company business in a manner consistent with contractual obligations, Delaware law, Federal and state securities law, and other applicable laws. Each Client reserves all rights with respect to these matters, including with respect to damages arising from duty of loyalty breaches by these directors.*

*Self-interested, impudent and imprudent governance not only undermines the Company's ability to finance the Company's business plan, but also undermines the investment thesis behind the Company's creation. **The Company has a governance crisis which is causing a financial crisis. For example, investors were excited to participate in the third-party arm's length financing proposal touted by the CEO on March 27th, but then a series of self-interested transactions have been offered instead**.*

*The Board has two choices: either (1) obtain the controlling shareholder's consent to establish and abide by a market-based and ethical governance structure in which he does not retain unilateral power to direct the Company (thereby opening the door to financing from third parties and from existing investors), or (2) "approve" bad-faith, unlawful self-interested transactions in which the existing controlling shareholder funds and directs the Company according to whim (thereby cutting off access to financing from third parties and existing investors), risking personal liability for each Board member from the damages that accumulate."*

98.     Interestingly, contrary to the position taken by Neugebauer in this Bankruptcy Case,

a subsequent letter from Kirkland & Ellis to GloriFi's Board on June 21, 2022, evidences that

Neugebauer *knew* the Series 1 noteholders were not converted in April 2022. Specifically, the June

21 letter, states:

> *"We note, based on information regarding capitalization provided in the data room, that the Company has withdrawn its prior assertion that the notes issued to the Noteholders were converted by the last insider offering."*

99.    The June 21 letter went on to address the latest, and perhaps most brazen, attempt

by Neugebauer to take GloriFi's assets, breach the contractual side letters, and harm GloriFi and

its other stakeholders in the process (all for the sake of enriching Neugebauer):

> *"We understand that the Company is now offering notes secured by assets of the Company in violation of section 5 of the Side Letters. As with the last insider offering, the Company has not provided any meaningful current financial information or other updated business plans; so the offering does not comply with the disclosure requirements of applicable securities laws. Nor does the new offering satisfy Delaware law requirements with respect to affiliate transactions.*
>
> *This secured note offering, like the last offering of which we are aware, has been specifically designed by insiders to benefit insiders, and Mr. Neugebauer, his family members, and affiliates in particular. This new offering is an even more brazen maneuver to benefit the Neugebauer group at the expense of other investors: the Company assets without any third party validation that Company's assets are worth hundreds of millions, then purports to grant a security interest in the assets of the Company to the insiders who participate in the last offering, all at a time when the Company is actually insolvent.*
>
> *Investors with massive amounts of available capital are already investors in the Company, and have made clear for months that capital is available to the Company on actual arms-length terms, once the Board and Mr. Neugebauer make the governance changes necessitated by Mr. Neugebauer's erratic behavior (such as his engaging in a drunken assault of an employee) and poor judgment (such as removing independent directors that object to his proposed affiliate transactions).*
>
> *If the Company does not wish to comply with its obligations to investors that are not Mr. Neugebauer, Mr. Neugebauer could promptly tender to the Noteholders a full return of their capital, plus expenses. We note however that prior offers from Mr. Neugebauer and the Company to return invested capital have proven to be ephemeral ploys made in bad faith.*
>
> *None of this is consistent with GloriFi values, nor is it consistent with the requirements of law. If the Company's leadership does not comply with legal obligations and GloriFi values to work cooperatively to achieve success, then Mr.*

*Neugebauer and each member of the Board will be held responsible for disloyalty
to the Company and its investors and for willful breaches of applicable law."*

---

**The Series 2 Notes – Neugebauer's fraudulent backdating, insider dealing, and other malfeasance.**

---

100.    In September 2022, Neugebauer knew the ship was sinking and – per the norm – his primary goal was to protect his own economic interests. In an early morning e-mail on September 12, 2022, Neugebauer stated *"we don't make it at GloriFi"* then *"[w]e need to really pivot into maximizing value."* Pivot from what, and to what? Maximize what value, and how? Neugebauer then revealed his intentions, "[w]e have to basically do a reorg outside of BK."

101.    What Neugebauer was suggesting, and what he then implemented, was to elevate the rights of insiders (including himself, of course) into those of an alleged secured creditor, take all value for such alleged secured creditor, and then start anew without GloriFi's massive debt. Thus, Mr. Neugebauer wanted to protect and elevate himself (and other insiders) and tank GloriFi in the process.

102.    Neugebauer engaged in various fraudulent activities, including intentional backdating of notes, and other bad acts with respect to the Series 2 notes. Neugebauer's wrongdoing with respect to the Series 2 notes in summarized in the Trustee's Post-Trial Brief from the trial in a related adversary proceeding (Adv. No. 24-03038-mvl) at Docket No. 135. Such brief is incorporated herein by reference.

---

**Shortly before the bankruptcy filing, Neugebauer – through one of his entities – took almost $4 million from the Company and attempted to fleece the Company of all its remaining cash.**

---

103.    In January 2023 (the month before the Company filed chapter 7 bankruptcy), Neugebauer went back to his familiar playbook and initiated a relentless pressure campaign against

GloriFi and its sole remaining director at the time (Hunter Bywaters) in an effort to force the immediate transfer of **all** the Company's remaining cash and assets to Neugebauer. At that time, Neugebauer **knew** that GloriFi would be filing for chapter 7 bankruptcy protection **within days**.

104.    Neugebauer even caused the filing of a bogus lawsuit against GloriFi regarding a sham note that Neugebauer made GloriFi enter with Neugebauer's separate entity – Banzai Advisory Group, LLC ("Banzai"). On January 24, 2023 (only 15 days before the bankruptcy filing), Bywaters e-mailed Neugebauer the following:

> *"I would like to point out before my impending removal from this board that before I was able to retain company counsel, you were leaning on me to turn over the vast majority of the company's liquid assets to you claiming that they belonged to you. When I refused to assent, you initiated a lawsuit against the company which company counsel analyzed and concluded was meritless."*

> *[. . .]*

> *"From that point in time, you have grown increasingly hostile in every way including threatening and disparaging me with unfounded accusations of criminal actions. You persisted in asking for turn over of these assets and for execution of secured loan documents on behalf of a loan advanced prior to me joint [sic] the board. Company counsel advised that capitulating to either of your demands could constitute bankruptcy crimes. You even offered me indemnification. But you cannot personally indemnify me against criminal sanctions and/or incarceration.*

> *[. . .]*

> *"Since you have been a director, your words and actions have demonstrated to me that you have irreconcilable difference with the company including that you consider all of the company's property to belong to you."*

> *"Now, you are apparently removing me as a director for refusing to provide you with information that is directly at the heart of Banzai's still pending action with the company, and you have still not identified a company appropriate use for that information."*

> *"I have grave concerns that without any check against your self interests by an independent director that you will take action contrary to the best interest of the company. I certainly hope that is not the case."*

105.    Incredibly, on the eve of bankruptcy, Neugebauer engaged in the same type of self-dealing (in clear violation of his fiduciary obligations to the Company) that Neugebauer brazenly executed in March and April 2022, which led to the investors losing confidence in GloriFi and the Company not being able to close the de-SPAC transaction. But it did not end there. Neugebauer's bad acts continued post-petition.

**The "DEGA Complaints" – the ultimate head fake.**

106.    During the pendency of this Bankruptcy Case, Neugebauer caused two lawsuits to be filed against various investors and former employees of GloriFi – one in Georgia and one in Delaware (collectively, the "DEGA Lawsuits"). The Trustee maintains that the filing of the DEGA Lawsuits constitutes a clear and egregious violation of the automatic stay (and was done for the wrongful purpose of chilling the Trustee's ability to monetize the Estate's assets).

107.    The DEGA Lawsuits can be fairly described as the conspiratorial ramblings resulting from Mr. Neugebauer's manic paranoia. Neugebauer generally alleges in the DEGA Lawsuits that the many defendants named therein somehow "conspired" to "steal the company" from Neugebauer (this premise alone – *i.e.*, "stealing" the Company *from Neugebauer* – highlights Neugebauer's lack of understanding of basic corporate governance).

108.    Neugebauer's long-time friend and business partner (Charlie Hamilton) testified that Neugebauer often sees "black helicopters" (meaning Neugebauer sees things that are not there – *i.e.*, a classic conspiracy theorist). Perhaps the fantastical story told by Neugebauer in the DEGA Lawsuits can be explained by Neugebauer's paranoia and known tendency of "seeing black helicopters." Or perhaps the real reason for the DEGA Lawsuits is that Neugebauer is a master in the art of deflection and projection.

*"Accuse your enemy of what you are doing,
as you are doing it, to create confusion."*

109.     The above quote is often attributed to Karl Marx, but it perfectly personifies Toby Neugebauer.

110.     First, in the DEGA Lawsuits, Neugebauer accuses the DEGA defendants of "stealing the company" and starting competing businesses. Yet the evidence shows it was *Neugebauer* who stole what he represented to investors as the Company's most valuable asset – the tech stack – and started a competing business.

111.     Specifically, in June 2022, as part of its Series 2 fundraising, GloriFi (at Neugebauer's direction) prepared a pitch-deck for potential investors. In the pitch-deck, GloriFi induced Series 2 investors with its proposed "Animo" product marketed to the Latino community, including the "IM" catchphrase throughout 40+ slides of marketing materials. GloriFi also marketed the integration of its vaunted "Best in Class Tech Stack" as a key to Animo's success. However, at or near the close of the Series 2 funding round, GloriFi's finances failed to improve on their downward trajectory; and with bankruptcy looming, GloriFi, at Neugebauer's behest, advice, and direction, conspired with one of Neugebauer's trusted lieutenants to transfer the Animo brand/concept into a new entity (using virtually the exact same name) for no value to GloriFi or its investors, including the Series 2 investors who were pitched (and induced to invest) with this exact concept as part of ***GloriFi's property***. The new company's website and marketing materials mirror – in some cases identically – the font, "IM" catchphrase, and even the same model photos as in GloriFi's pitch-deck. If Neugebauer conspired to provide GloriFi's property to the new company for ***nothing***, then Neugebauer breached his fiduciary duty to GloriFi. If Neugebauer provided GloriFi's property to the new company for equity or hypothecated equity/ownership, then

he engaged in rank misappropriation of GloriFi's property, in addition to breaching his fiduciary duties.

112.    Second, in the DEGA Lawsuits, Neugebauer accuses the DEGA defendants of leaking the Company's allegedly "confidential" information to the Wall Street Journal. Yet the evidence shows that it was *Neugebauer* who was his own "mole," because Neugebauer intentionally provided the Wall Street Journal access to *his emails and text messages*. It is truly incredible that Mr. Neugebauer made the allegations against others regarding the Wall Street Journal when it was Mr. Neugebauer himself who "opened the kimono" to one of the biggest publications in the country.

113.    Finally, in the DEGA Lawsuits, Neugebauer accuses the DEGA defendants of violating non-disparagement provisions set forth in stockholders' agreements. Yet the evidence shows that it was *Neugebauer* who implemented a relentless smear campaign against GloriFi's "employees, officers, and existing and prospective customers, suppliers, investors, and other associated third parties" in violation of Section 5.04 of his own Amended and Restated Stockholders Agreement (not to mention Neugebauer's violation of the non-disclosure provisions set forth in Section 5.04).[1]

114.    To conclude, the Trustee will end where he started. Mr. Neugebauer refuses to look at the man in the mirror. If he did, Mr. Neugebauer would see that it is he who is guilty of everything for which he accuses others; and it is he who is responsible for the enormous financial harm suffered by GloriFi – specifically, going from a company on the precipice of closing the de-

---

[1]    Moreover, Neugebauer engaged in a variety of other bad acts post-petition that the Court has already determined constitutes an "abuse of the bankruptcy process," all of which caused significant harm to the Estate.

SPAC transaction and going public at a valuation of approximately ***$1.7 billion*** and landing in chapter 7 bankruptcy only months later.

## V.
### CAUSES OF ACTION

**COUNT 1:**     **BREACH OF FIDUCIARY DUTY (AGAINST ALL DEFENDANTS)**

115.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

116.    Neugebauer, as the Company's CEO and chairman of the Company's Board, and the Neugebauer Family, as the Company's majority and controlling stockholder,[2] owed the Company and its stakeholders various fiduciary duties, including, but not limited to, the duty of loyalty.

117.    For the many reasons set forth herein, Defendants intentionally and brazenly breached the fiduciary duties they owed GloriFi and its stakeholders (in almost every way imaginable). As a result of Defendants' many breaches of their fiduciary duties, GloriFi and its Estate suffered substantial monetary harm. Specifically, as a result of Defendants' egregious breaches of their fiduciary duties, GloriFi was unable to complete the de-SPAC transaction and go public at a valuation of approximately $1.7 billion. Instead, as a result of Defendants' breaches of their fiduciary duties, GloriFi sits in chapter 7 bankruptcy.

118.    The Trustee seeks all recoverable damages from Defendants resulting from their breaches of their fiduciary duties, including, but not limited to, the entire loss of GloriFi's

---

[2]      "Historically, Delaware cases have equated the duties of stockholder controllers with those of directors . . . . When a stockholder controller exercises board-level control, takes over the corporate machinery, and effectively substitutes its wishes for those of the board of directors, then the proposition of fiduciary equivalence is accurate." *McRitchie v. Zuckerberg*, 315 A.3d 518 (Del. Ch. Ct. 2024).

enterprise value and disgorgement of any monetary value and/or benefit Defendants received that is in any way related to, or resulted from, the breaches of their fiduciary duties.

COUNT 2:       SECURITIES FRAUD (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5) (AGAINST TOBY NEUGEBAUER)

119.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

120.    The elements of a securities fraud claim based on Section 10(b) and Rule 10b-5 are (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss.

121.    As set forth herein, Neugebauer made numerous material misrepresentations and/or omissions in connection with the sale of the Series 1 and Series 2 notes. Such material misrepresentations and/or omissions materially and negatively impacted the Company's enterprise value.

122.    The Trustee seeks all recoverable damages from Neugebauer resulting from his violations of Section 10(b) of the Exchange Act and Rule 10b-5, including, but not limited to, the entire loss of GloriFi's enterprise value.

COUNT 3:       NEGLIGENCE AND GROSS NEGLIGENCE (AGAINST TOBY NEUGEBAUER)

123.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

124.    Gross negligence involves "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005). If the acts taken by Neugebauer

set forth herein do not meet such definition of gross negligence, it is hard to imagine what would. Alternatively, the Trustee asserts a claim for ordinary negligence against Neugebauer based on his mismanagement of GloriFi as outlined herein.

125.    The Trustee seeks all recoverable damages from Neugebauer resulting from his gross negligence and negligence.

<u>**COUNT 4:**</u>       **BREACH OF CONTRACT (AGAINST ALL DEFENDANTS)**

126.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

127.    Defendants are parties to the Amended and Restated Stockholders Agreement (the "Agreement"), which is dated effective as of December 3, 2021, and was signed by Mr. Neugebauer personally and on behalf of the Neugebauer Family.

128.    For the reasons set forth herein, Defendants breached the Agreement (specifically, Section 5.04 of the Agreement).

129.    The Trustee seeks all recoverable damages from Defendants resulting from their breach of the Agreement.

**VI.**
**ATTORNEY'S FEES AND EXEMPLARY DAMAGES**

130.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

131.    An award of exemplary damages is appropriate, and needed, in this case because the conduct of Toby Neugebauer (individually and on behalf of the Neugebauer Family) exhibits a wanton or wilful disregard for the rights of GloriFi and its Estate. Under Delaware law, for a defendant's conduct to be found wilful or wanton the conduct must reflect a "conscious indifference" or "I don't care attitude." *Eustice v. Rupert*, Del. 460 A.2d 507 (1983). This is the

textbook case of wilful or wanton conduct, and an award of exemplary damages is necessary to deter Neugebauer from engaging in similar conduct in the future.

132.     The Trustee further seeks an award of the reasonable and necessary attorney's fees and costs incurred in pursuing this action.

## VII.
## CONDITIONS PRECEDENT

133.     All conditions precedent to maintaining this action have occurred and been satisfied or have been excused and/or waived.

## VIII.
## CONCLUSION

Based on the foregoing, the Trustee respectfully requests the following relief from the Court:

a)  Judgment against Defendants for all actual damages;

b)  Judgment against Defendants for exemplary damages;

c)  Judgment against Defendants for pre- and post-judgment interest at the maximum rate permitted by law;

d)  Judgment against Defendants for costs of suit and reasonable and necessary attorney's fees; and

e)  Such other and further relief to which the Trustee is entitled.

Respectfully submitted,

*/s/ Chase J. Potter*

**CHASE J. POTTER**
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com
**JOSHUA J. IACUONE**
Texas Bar No. 24036818
E-Mail: josh@imcplaw.com
**GREG MCALLISTER**
Texas State Bar No. 24071191
E-Mail: greg@imcplaw.com
**JOSHUA L. SHEPHERD**
Texas Bar No. 24058104
E-Mail: shepherd@imcplaw.com
**JESSE A. OKIROR**
Texas Bar No. 24065843
E-Mail: jesse@imcplaw.com
**ANNA OLIN RICHARDSON**
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:    (214) 432-1536
**COUNSEL FOR THE AGENT AND
PROPOSED SPECIAL COUNSEL FOR TRUSTEE**

-and-

**DAVOR RUKAVINA**
Texas Bar No. 24030781
**THOMAS D. BERGHMAN**
Texas Bar No. 24082683
**BRENDA L. FUNK**
Texas Bar No. 24012664
**CONOR P. WHITE**
Texas Bar No. 24125722
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6605
Telephone: (214) 855-7500

**COUNSEL FOR TRUSTEE**